UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Darwin Gerdes,

Plaintiff,

vs.

Ron Myers, individually as an officer
of the Brainerd Police Department,
and City of Brainerd,

Defendants.

Case No. 08-CV-557 MJD/AJB

PLAINTIFF'S MEMORANDUM
IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

---

## INTRODUCTION

On June 1, 2007, Brainerd police officer Ron Myers ("Myers") fired his taser into Darwin Gerdes's ("Gerdes") back as he sped away on his bicycle. In doing so, Myers violated the Fourth Amendment to the U.S. Constitution, Graham v. Connor, Taser International's warnings and training materials (which mirror the constitutional prohibitions), and common sense. Meyers's taser deployment deprived Gerdes of the ability to use his arms and legs on the vehicle he was riding and caused him to fall violently enough to fracture his clavicle, injure his shoulder, and herniate a disk in his back. These foreseeable injuries from the foreseeable fall required 3 surgeries, 10 days of hospitalization, and the expenditure of over $67,000 in medical bills, along with the pain and suffering that was a consequence of his injuries, the surgical invasions, and the resulting MRSA infection.

On the subject night, Gerdes and three friends were in a Brainerd city park after it closed. Myers, a Brainerd police officer, went to the park to investigate a noise complaint. Myers saw Gerdes and his friends start to disburse from inside the park on bicycles.

Without observing anything more serious than being in the park after hours, a potential misdemeanor ordinance violation, and without regard to the probability of injury from tasing someone off a rapidly-moving bicycle, Myers deployed his taser into Gerdes's back while Gerdes was pedaling his bicycle at high speed through a tree-filled park at night. Not surprisingly, the taser worked. As a direct result, Gerdes lost all control of his arms, legs, and balance, crashed his bike, and landed on a concrete path.

Defendants now want the Court to take the Fourth Amendment's objective reasonableness test from the jury and conclude as a matter of law that Myers's actions were reasonable. There are few excessive force cases in which summary judgment is appropriate, See Duncan v. Storie, 869 F.2d 1100, 1103 (8th Cir. 1989)(stating that the alleged use of excessive force is generally an issue of fact for the trier of fact to determine). This is not one of them. A straightforward application of the factors laid out in Graham v. Connor, 490 U.S. 386 (1989) dictates that Myers's conduct in tasing Gerdes off of a moving bicycle for a minor misdemeanor ordinance violation was unreasonable. The easy foreseeability and severity of Gerdes's injuries also demand this result. Furthermore, Myers is not entitled to qualified immunity because any reasonable officer would know this conduct was unlawful. Reasonable officers, and people generally, understand that knocking a person off of a moving bicycle can cause serious injury, and case law establishes that police officers cannot knock suspects from bicycles simply for failing to obey police commands. Moreover, Myers's use of a taser compounded the ordinary falling risk by rendering Gerdes wholly unable to control or break his fall and thereby prevent injury. Accordingly, Myers's use of force "violated all generally accepted practices, training, and legal mandates regarding use of

force generally and taser specifically."(Ex. A[1], J. Ryan Report, ¶ 40.)

Finally, the City is not entitled to qualified immunity because a jury may reasonably conclude that the City's deficient training caused Gerdes's injury.

## STATEMENT OF FACTS

**A.    Background Information.**

**1.    The Parties.**

On June 1, 2007, Darwin Gerdes was 41-years-old.  He is a smaller man at only 5'9" tall and 150 pounds.  (Gerdes Dep. 61.)  Gerdes was involved in a serious motorcycle accident in 1998 in which he suffered a traumatic brain injury and was hospitalized for around three months.  (Gerdes Dep. 24.)  The accident affected Gerdes's cognitive and physical functioning, and he has been on social security disability since the accident.  (Gerdes Dep. 38-39, 48-49.)

Defendant Myers is 6 feet tall and weighs 190 pounds.  (Ex. B, Defs' Answer, ¶ 7.) He has been in law enforcement since 1995 and has been with the Brainerd Police Department since 2001.  (See Myers Dep. 4-6.)  Myers was first trained on and had been operating a taser in his weapons arsenal since 2003.  (Myers Dep. 10-11.)  Oddly, despite this length of time armed with a taser, Myers has never read the operating manual.  (Myers Dep. 12.)  As part of Myers's taser training, he learned of the general risk of falling injuries for people who are tased.  (Myers Dep. 14.)  During his taser training, Myers was tased and lost the ability to control his arms and legs, and he understands that the taser is designed to, and has this effect, on subjects.  (Myers Dep. 21-24.)

---

[1] Unless otherwise noted, all exhibits are attached to the Affidavit of Robert Bennett.

Myers's prior taser deployments include once against a suicidal male thought to be armed, once against a combative woman, and once against a suspect with an edged weapon who charged Myers. (Myers Dep. 89-93.) As will be shown, these taser deployments stand in marked contrast to the deployment against Gerdes, who was not combative, armed, or a threat to himself or others.

### 2.     Gregory Park in Brainerd, Minnesota and Related Ordinances.

The incident occurred in Gregory Park in Brainerd. Gregory Park is comprised of 4 city blocks and has pathways that bisect the park, with several gazebos or pavilions. (Ex. C, Map of Park.) It is a large green space, with many trees. (Id.) Brainerd City ordinances make it a misdemeanor to be in the park between 10:00 p.m. and 6:00 a.m., except for people traveling across the park without delay on established paths. (Ex. D, Brainerd City Code §§ 815.03, 2000.01.) Brainerd also has an ordinance prohibiting noise that annoys or disturbs others, making it a misdemeanor. (Ex. E, Brainerd City Code §§ 2014.01, 2014.03.) Despite these ordinances, no one has been custodially arrested for being in the park after hours or violating the noise ordinance. (Bolduc Dep. 15-16; Ruuhela Dep. 63, 65; Myers Dep. 58-59; Ex. F, Defs' Ans. to Int. No. 9.)

### 3.     The X-26 Taser.

A taser is a "significantly violent level of force." Parker v. City of South Portland, 2007 WL 1468658 *22 (D. Me. May 18, 2007) (citation omitted) (Attached as Ex. G.) Defendant Myers tased Gerdes with an X-26 taser. (Myers Dep. 11.) This is the most powerful taser model in general police service and uses 50,000 volts to incapacitate subjects. (Larson Dep. 54-55; Ex. H, Taser Int'l "Incapacitation Ratings" slide and "Electrical 101" slide; see also

Ex. I, Brainerd Taser Policy)    The X-26 taser in probe mode uses "Neuro Muscular Incapacitation" technology to override "the command and control systems of the body to impair muscular control." (Ex. J, Taser Brochure.)    In layman's terms, and as described by Myers, a taser so incapacitates the subject that he cannot control his arms and legs and falls. (Myers Dep. 21.)    The X-26 taser can also be used in drive stun mode, in which the probes are not fired and it does not incapacitate the subject; in this mode, it is simply a pain-compliance device.[2]    (Ex. H, Taser Int'l "Drive Stun Backup" slide.)    Myers used his taser in the probe mode on June 1, 2007.

### a.    Taser International's Warnings.

Similar to other police service weapons (pistol, chemical weapons, batons, etc.) and other dangerous tools (chainsaws and power augers), each taser comes with an operating manual, which includes operator warnings.    (Ex. J, Taser Brochure; Ex. K, Taser Operating Manual.)    Specifically, the X-26 Operating Manual states, "**Read, understand and follow the warnings and safety instructions contained in the enclosed Product Warnings document included with this weapon.**" (Ex. K (emphasis added).)    Inexplicably, Myers claims he never read the operating manual, and claims he never received it from the Brainerd Police Department.    (Myers Dep. 12.)    It is totally unreasonable to use any weapon on a subject without knowing or understanding the dangers inherent in using the product as identified by the product manufacturer.

As shown by the Product Warnings document included with each taser, Taser

---

[2] While many cases on taser usage fail to identify whether the taser was used in probe or drive stun mode, the probe mode (used in this case), due to its total incapacitation effect, creates a significantly increased risk of injury.

International recognizes that there are serious risks involved in using a taser and instructs law enforcement that "[e]ach TASER device discharge must be legally justified." (Ex. L, Taser Product Warnings-Law Enforcement, p. 1.) Taser International's 30(b)(6) witness testified that "a lot" of Taser's training, instructions, and warnings are based on the law governing use of force. (Brave Dep. T. 88-89.) Taser's warnings include a footnote, stating, in part: "These warnings do not create a more restrictive standard of care than applicable law." (Brave Dep. 56.)

Not surprisingly, Taser's Product Warnings document directs users to "Read, understand, and follow the training, safety instruction, and warnings before using the Taser device. (Ex. L, Taser Product Warnings-Law Enforcement, p. 1.) Regarding injury risks of using the taser, Taser's Product Warnings document warns of the following:

> **Secondary Injury Risks.** TASER-induced strong muscle contractions usually render a subject temporarily unable to control his or her psychomotor movements. This may result in secondary injuries such as those due to falls. This loss of control, or inability to catch oneself, can in special circumstances increase the risk(s) of serious injury or death. . . . **Other persons at higher risk include: those located on elevated or unstable platforms** (e.g. trees, roofs, ladders, ledges, cranes, loading docks), **operating a vehicle or machinery, or those who are running.** Persons located in water may drown if their ability to move is restricted.

(Id. at p. 4 (emphasis added).) Sadly, similar to the operating manual, Myers has never read or seen this critical Product Warnings document. (Myers Dep. 16-17.) This is especially troubling because Taser includes the Product Warnings document in its taser training materials. (Bennett Aff. ¶ 3; Larson Dep. 11, 15-16.)

Even if Myers did not receive the operating manual or the Product Warnings

document, slides in the power point presentation he was trained on would have provided essentially the same information.  Brainerd's taser training is based on a power point presentations with attached materials from Taser International.  (Larson Dep. 41-43; Myers Dep. 13.)  One slide in the training entitled "Possible Taser Side Effects," states, "Can cause secondary injuries from person falling[:] fall injuries, particularly from elevated heights, can pose risk of significant injury or death."  (Ex. H-1, Taser Side Effects slide.)  Additionally, a slide on tactical considerations notes in relevant part:  "Elevated Deployment Risk Examples:  Subject running; Subject in elevated position; [and] Operating vehicle or machinery[.]"  (Id. at Tactical Considerations slide)

Myers admits that he saw these two slides or at least "very similar" slides in his taser training. (Myers Dep. 93-94.)  Moreover, he agreed with the propositions contained in the slides: tasers may cause secondary injuries from falls, and people who are running, in an elevated position, or operating a vehicle or machinery are at an increased risk of injury. (Myers Dep. 94-98.)  Accordingly, Myers cannot claim ignorance of these important considerations or warnings simply because he did not receive the X-26 operating manual or the Product Warnings document.

> **b.**     **Taser Usage Guidelines by Preeminent Law Enforcement Organizations.**

The Police Executive Research Forum ("PERF") "is a national membership organization of progressive police executives from the largest city, county and state law enforcement agencies."  (Ex. M, PERF Mission Statement.)  "PERF is dedicated to improving policing and advancing professionalism through research and involvement in public policy debate."  (Id.)  In short, PERF is "one of law enforcement's most respected

think-tanks." (Ex. A, Ryan Report, 13.)  According to PERF, "[tasers] should only be used against persons who are actively resisting or exhibiting active aggression, or to prevent individuals from harming themselves or others.   [Tasers] should not be used against a passive suspect." (Ex. N, PERF Conducted Energy Device Policy, p. 1.)  Further, "[t]hat a subject is fleeing should not be the sole justification for police use of a [taser].  Severity of offense and other circumstances should be considered before officers' use of a [taser] on the fleeing subject." (Id.)  This view is consistent with that of the United States Department of Justice, which has identified that flight should not be the sole justification for use of a taser. (Ex. O, USDOJ Technical Assistance Letter to Orange County, p. 5.)   Additionally, per PERF, absent exigent circumstances, tasers should not be used against suspects in physical control of a vehicle, including a bicycle.  (Ex. N, PERF Conducted Energy Device Policy, p. 3.)

The International Association of Chiefs of Police ("IACP") is the oldest and largest nonprofit membership organization of police executives with 20,000 members in more than 89 countries.  (Ex. P, IACP Information, p. 1.)  The IACP strives to "advance the science and art of police services; to develop and disseminate improved . . . operational practices and promote their use in police work; . . . and to encourage adherence of all police officers to high professional standards of performance and conduct." (Id. at p. 3.)  Brainerd's Chief Bolduc is a member of the IACP and admits that it does considerable work with training and crafting policies.  (Bolduc Dep. 30-31.)  The IACP directs that officers should only consider using a taser if they can "reasonably articulate grounds to arrest or detain a subject, and the subject has demonstrated that he or she will likely use physical force to resist the arrest or

detention, or may otherwise assault or attempt to assault the officer, another person, or himself or herself." (Ex. Q, IACP Policy, p. 10.)

The PERF and IACP guidelines are especially significant because Taser International includes these guidelines with its training materials. (Bennett Aff., ¶ 4.) As will be shown, Myers violated these guidelines, and ignored Brainerd's own taser policy, which states: "Officers must not overlook the aspect of injury that may result in falling from a standing position after deployment of the advanced taser. (Ex. I, Brainerd Taser Policy.)

## B.      The June 1, 2007 Incident.

On June 1, 2007, Gerdes and several friends went to a bar and were drinking. They all rode bicycles that night. (Gerdes Dep. 100.) While taking a break from the bar, they ended up in Gregory Park at around 11:30 p.m., which was after the park closed. (McSorley Dep. 30.) Gerdes was in the park with Justin McSorley, Eddie Simmons, and Kevin Gertly. (Gerdes Dep. 75; McSorley Dep. 11, 24.) Several members of the group, including Gerdes, smoked a small amount of marijuana in the park. (Gerdes Dep. 107-108.) After around 10-15 minutes in the park, Gerdes and his companions decided to race back to the bar, with the last one to arrive at the bar buying the first round. (McSorley Dep. 30-31; Gerdes Dep. 107, 110; Simmons Dep. 11-12.) In part, they left because Gerdes had seen a squad car parked on a street next to the park. (Gerdes Dep. 112; McSorley Dep. 31.) However, no one had seen an actual police officer or heard any commands to stay put before they started to leave the park. (McSorley Dep. 32-33; Gerdes Dep. 112-18.) This is consistent with Myers's testimony that when he first saw Gerdes and his friends, they were disbursing. (Myers Dep. 63.) Also in the park at this time was a group of loud, obnoxious kids. (Simmons Dep. 23.)

Gerdes and his companions were quiet. (Id.)

Unbeknownst to Gerdes and the others, a resident near the park had called in a noise complaint. The Brainerd Police Department dispatched Myers to the scene, stating, "721 for a noise complaint. . . . about four or five kids talking loudly, comp[lainant] is worried they **may** break into a fight." (Ex. R, Radio Transmission Transcript (emphasis added).)[3]

Myers arrived at Gregory Park at approximately 11:41 p.m., about the same time as Crow Wing County Deputy Mike Ruuhela. (Ex. S, Myers's Report at 2.) Ruuhela testified that he did not have his lights and siren operating when he arrived on the scene (and the evidence suggests Myers arrived similarly), indicating this was not an emergency. (Ruuhela Dep. 18-19.) Ruuhela specifically noted that a noise complaint is not a severe crime. (Ruuhela Dep. 20.) While out of their squad cars, Myers and Ruuhela could hear loud voices from the center of the park. (Myers Dep. 54.) Based on hearing loud voices and shouting, but without seeing any of the activity, Ruuhela admitted that he could not have arrested anyone. (Ruuhela Dep. 29.) Myers directed Ruuhela to drive his squad car around to the north side of the park and shine his spotlight into the park. (Myers Dep. 54-45.) Myers approached the center of the park on foot from the south. (Myers Dep. 55.)

After separating from Ruuhela, Myers never saw Ruuhela's squad car on the north side of the park nor did he see Ruuhela shine his spotlight into the park. (Myers Dep. 55-57.) Similarly, Gerdes never saw Ruuhela shine his spotlight into the park. (Gerdes Dep.

---

[3] Defendants recite the 911 call verbatim for 3 ½ pages of their memorandum, but the 911 discussion was not conveyed to Myers and therefore is not relevant. See Cole v. Bone, 993 F.2d 1328, 1333 (8th Cir. 1993) (holding that "[i]n analyzing the reasonableness of [defendant's] decision to use deadly force, we examine the information that [defendant] possessed at the time of his decision.") Myers was only given the dispatch information noted above in Exhibit R.

132.)  Despite not seeing Ruuhela, Myers report states, "once Deputy Ruuhela reached the north end of Gregory Park a group of males noticed Deputy Ruuhela in his squad car and began to flee from the area on bicycles."  (Ex. S, Myers's Incident Report.)  Myers's report is without foundation and is misleading.  Without seeing or knowing the location of Ruuhela, and without hearing the individuals describe their intentions, he had no knowledge of why Gerdes and his friends were leaving the park.  (Myers Dep. 69-71.)  Ruuhela circled the park with his spotlight on but saw no criminal behavior and nothing that would allow him to make a legal arrest.  (Ruuhela Dep. 33-34.)

As Myers approached Gerdes's group, he hid behind a tree to assess the situation.  (Myers Dep. 62.)  When he first saw the group, they were already disbursing on bicycles.  (Myers Dep. 63.)  Further, Myers did not see Gerdes and his group making any noise to establish a violation of the noise ordinance.  (Myers Dep. 62, 77-78.)  Accordingly, at that point, the only criminal activity Myers had observed was the group possibly violating the city park ordinance, a misdemeanor offense.  (Myers Dep. 62.)  That Myers had actually witnessed a violation of even this ordinance is dubious since he only saw Gerdes's group disburse (moving) and the ordinance allows people to traverse the park without delay.  (See Ex. D, Brainerd City Code § 815.03.)

As they raced out of the park, Simmons was in the lead and the first one out of the park, with Gerdes third and McSorley last.  (McSorley Dep. 32, 35; Simmons Dep. 12-13.)  As they were pedaling out of the park, Gerdes's companion, Justin McSorley, heard Myers yell, "Stop or be tased," but Myers did not identify himself as a policeman.  (McSorley Dep. 36-37.)  McSorley was the closest individual to Myers and was almost within arm's reach of

him.  (McSorley Dep. 42.)  Gerdes did not hear Myers yell at him to stop and never saw
Myers chasing him.  (Gerdes Dep. 118-19.)  Gerdes's other companion also heard the
warning to stop or be tased but stated Myers did not identify himself as a police officer.
(Simmons Dep. 21, 28.)[4]

Myers testified that he was chasing Gerdes and was directly behind him when he gave
the command to stop.[5]  (Myers Dep. 66.)  Myers then pulled out his taser as he ran after
Gerdes.  (Myers Dep. 76.)  At the time Myers pulled out his taser, all of the potential targets
(everyone in Gerdes's group) were on bicycles.[6]  (Myers Dep. 76-77).  Gerdes did not stop,
and Myers then deployed his taser into Gerdes's back.  (Myers Dep. 79.)  Just before Myers
fired his taser, **Gerdes was riding his bike faster than Myers could run at full speed**.
(Myers Dep. 122 (emphasis added).)  Myers acknowledged that Gerdes posed no threat to
Myers or others at this time.  (Myers Dep. 114-15.)  Myers deployed his taser even though he
was taught that a taser makes people unable to control their movements and may result in
secondary injuries from falls.  (Larson Dep. 15-16.)  He consciously ignored the obvious
implications of this lesson.

---

[4] Myers claims that he yelled, "Stop, police!;" however, taking the facts in the light most
favorable to Gerdes, the Court must assume he did not identify himself as a policeman.  See
Graves v. Arkansas Dep't. of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000).

[5] Myers tried to justify his attempt to stop Gerdes and his group by noting that there had
been fights and drug deals in the park before and so he "[didn't] know at this time if
somebody's laying in the brush injured, if they had been assaulted, or not."  (Myers Dep. 65.)
But none of these things had occurred, and Myers admitted at deposition that he had not
perceived any fighting, physical exertion, or moaning from any injured party.  (Myers Dep.
65.)  He also admitted that he is not allowed to imagine things while on a call.  (Myers Dep.
65.)

[6] Myers claims that Gerdes turned around and looked at him.  (Myers Dep. 78-79.)  Myers
then shouted a second time, "Stop, police, or you will be tased."  (Myers Dep. 79.)  This
assertion must be disbelieved at this stage given testimony that Myers did not identify
himself as a police officer and Gerdes's testimony that he did not see Myers.

Predictably, after being tased, Gerdes became unable to balance, steer, or pedal, lost control of his bicycle, and crashed onto the concrete. (Gerdes Dep. 120-22; Myers Dep. 79-80.) Gerdes landed so hard that he fractured his collarbone, herniated a disc in his back and injured his shoulder. (See infra Fact, § C.)

Myers then arrested Gerdes and brought him to the Crow Wing County Jail. (Myers Dep. 79-80.) Prior to his booking, the jail nurse examined Gerdes and recognized that he needed medical attention. (Myers Dep. 80-81.) Myers then brought Gerdes to St. Joseph's Emergency Room. (Myers Dep. 81.) At St. Joseph's, Myers cited Gerdes for two petty misdemeanors (possession of a small amount of marijuana and possession of drug paraphernalia) and a misdemeanor for fleeing an officer by other than a motor vehicle. (Myers Dep. 82.) Curiously, despite the petty misdemeanor offenses, Myers claims he did not charge Gerdes with violating the noise ordinance or park ordinance because he did not want to "nickel and dime" Gerdes. (Myers Dep. 85.) Additionally, Myers did not arrest or cite McSorley, who was in the park after hours with Gerdes. (Myers Dep. 87.) Accordingly, Gerdes's misconduct was so minor that, in McSorley's case, it did not even warrant a citation. All of the charges levied against Gerdes were wholly dismissed. (Myers Dep. 83-85.)

## C.   Gerdes Suffered Significant Injuries, Including a Broken Collarbone and a Herniated Disc That Required Surgery.

At St. Joseph's, Gerdes was noted as having an "obvious deformity of the right mid clavicle" and diagnosed with a "minimally displaced fracture, mid right clavicle." (Ex. T, St. Joseph's ER Note.) He was given medication for the pain and a sling for his arm. (Id.)

Then shortly after the subject incident, Gerdes developed lower back pain going

through his hip down to his left foot.  (Ex. U, Freese Letter at 1.)  Gerdes underwent an MRI in August 2007 and was diagnosed with a very significant disc herniation at L4-5.  (Id. at 2.)  Gerdes began seeing Dr. Freese, a neurosurgeon, regarding his treatment.  Dr. Freese recommended that Gerdes first undergo conservative treatment, including an epidural injection, but this brought Gerdes no relief.  (Id.)

On October 15, 2007, Gerdes underwent surgery for his back and hip pain.  (Id.)  Specifically, he underwent a hemilaminectomy which showed a "very large disc herniation" as well as evidence of some scar tissue.  (Id.)  He was kept in the hospital for two days and discharged on October 17, 2007, but unfortunately he developed an infection—antibiotic resistant staph infection (MRSA)—soon after the surgery.  (Id.)  Gerdes underwent a second surgery on October 25, 2007 where his surgical site was irrigated and debrided.  (Id. at 2-3.)  Gerdes was hospitalized until Nov. 1, 2007, and after that received significant home healthcare, including IV antibiotics for a month.  (Gerdes Dep. 19-20; Ex. V, St. Cloud Hospital records, 11-1-07 Discharge Summary.)  Further, following his second surgery, he continued to have significant back and leg pain and underwent physical therapy.  (Ex. U, Freese Letter at 3.)  While Gerdes has a history of back pain, as noted by Dr. Freese, until the 6/1/07 injury, Gerdes was able to function quite well.  (Id. at 3.)  Gerdes's subsequent large disc herniation compared to prior MRIs make it "clear-cut that the injury that occurred on 6/1/2007 was directly and causally responsible for the development of this disc herniation."  (Id. at 3.)

Further, in the fall of 2008 Gerdes sought treatment for problems with his shoulder that he had been having since the subject incident.  (Id. at 4; Gerdes Dep. 10-13.)  He was

diagnosed with a shoulder impingement with AC joint arthritis.  (Ex. W, Rud Letter.)  After conservative treatment failed, Gerdes underwent arthroscopic decompression of his shoulder and had to follow up with physical therapy.  (Id.)

Gerdes's total treatment for the three surgeries and related care exceeds $67,000 and he spent 10 days in St. Cloud Hospital.  (Ex. X, Medical Bill Summary; Ex. V, St. Cloud Hospital Records, 10-15-07 and 11-1-07 Discharge Summaries.)

**D.    Testimony and Common Sense Dictate that Gerdes was Operating a Vehicle, One that Required His Control Over His Arms and Legs.**

A bicycle is "**a vehicle** consisting of a light frame mounted on two wire-spoked wheels, one behind the other, and having a seat, handle bars for steering, brakes and two pedals or a small motor by which it is driven."  American Heritage Dictionary (emphasis added).  The obvious fact that a bicycle is a vehicle is supported by the testimony of Myers, Ruuhela, and Chief Bolduc.  (Myers Dep. 24-25; Ruuhela Dep. 43; Bolduc Dep. 25.)  It is also supported by the Brainerd City Code and Minnesota Statutes, which grant bicyclists all rights and duties applicable to drivers of "any other vehicle." Minn. Stat. § 169.222, subd. 1 (emphasis added); see also Brainerd City Code § 1335.03 (attached as Ex. Y).  Because a bicycle is a vehicle, persons operating a bicycle are covered by specific warnings from Taser International as well as PERF and are obviously at higher risk of injury than persons who are simply standing still on the ground.  (See Supra, Facts, §A.3.a & b.)

Based on his taser training where he lost control of his arms and legs, and based on having ridden a bicycle, Ruuhela testified that he would not want to be tased while on a bicycle, and he understandably believes a person would fall off a bicycle when tased. (Ruuhela Dep. 42-43.)  Chief Bolduc, Myers, and Ruuhela agreed that a person needs the use

of their arms and legs to operate a bicycle (Bolduc Dep. 26; Myers Dep. 26; Ruuhela Dep. 45.)  Ruuhela called this common sense.  (Ruuhela Dep. 45.)  Both Myers and Ruuhela understand that it might be dangerous to tase someone operating a vehicle or machinery. (Myers Dep. 97-98; Ruuhela Dep. 46-47.)  Similarly, both Myers and Bolduc understand that a bicycle crash can cause significant injuries, including fractures and emergency room visits. (Myers Dep. 28; Bolduc Dep. 27-29.)

**E.     The Deficiencies of Brainerd's Taser Training.**

Defendant Myers received taser training in March 2007 from Sergeant Joy Larson. (Myers Dep. 12-13.)  At deposition, Larson admitted that the first consideration for use of a taser is whether the use of force is authorized (Larson Dep. 59).  But despite this admission, and despite being a certified taser instructor, she claims she does not offer any instruction on use of force.  (Larson Dep. 33.)   Larson testified: "I do not teach them when to use the Taser.  I teach them the use of the Taser, how it works and then the circumstances under which they need to consider."   (Larson Dep. 58.)   It is unreasonable and deliberately indifferent to teach officers how, but not when, to use a weapon the agency places in their arsenal.

Larson does not even properly teach students the use of the taser.  For example, she believes that officers should read the operating manual when they first get the weapon, yet she does not instruct her students to do so.  (Larson Dep. 43.)  Further, she has not read the operating manual for the X-26 Taser on which she instructs.   (Larson Dep. 11.)

Larson's knowledge of warnings offered by Taser International is simply deficient for her own use, let alone instruction on a taser.  For example, she could not even say whether

the Department of Justice recommendation to not use a taser when someone is in control of a vehicle in motion is consistent with Taser's warnings or instruction materials.  (Larson Dep. 39.)

Sgt. Larson's deficient knowledge and training are also evidenced by her testimony regarding whether the risk of injury increases when the target is on a bike.  Larson testified that the risk from a taser "would be the same physical reaction that you would have if you were tasing someone who was walking, running, standing.  The effects of the taser are the same regardless of what you are doing."  (Larson Dep. 22.)  This statement belies common sense as well as specific warnings from Taser International regarding an increased risk of injury for persons that are running or operating vehicles.  (Ex. L, Taser Product Warning, 4.)

The inadequacy of Brainerd's taser training is also shown by Myers's testimony that the Brainerd Police Department did not provide him with any warnings issued by Taser regarding the X-26 Taser or its operating manual.  (Myers Dep. 12, 15-16.)

Interestingly, when Myers and other officers are tased in training, they have officers standing on both sides of them to catch them and avoid secondary injuries from falls.  (Larson Dep. 45-46, 52; Myers Dep. 28-29.)  This fact alone evidences that officers know that tasing someone can lead to secondary injuries from falls, even when standing on mats designed to lessen the danger from falls.  Each agency and each tased officer knows of the workers' compensation risk attendant to the ordinary falling risk in training, which is significantly greater in real-world usage, where falls occur on concrete, asphalt, or hardwood floors, and where curbs, furniture and other obstacles increase the risk of injury and no one is there to catch you.

**F.    The City Rubber-Stamped Myers's Taser Usage after a Cursory Review.**

Chief Bolduc testified that prior to this lawsuit, he reviewed Myers's use of a taser on Gerdes on June 1, 2007.    (Bolduc Dep. 12-13.)    He found Myers's use of the taser acceptable.  (Bolduc Dep. 13.)  Chief Bolduc's review was based solely on Myers's report of the incident, not on any discussion with Myers about what actually happened or what Myers was actually confronted with.  (Bolduc Dep. 16.)  Bolduc's approval is likely related to his view, in direct disagreement with PERF's guidelines, that fleeing is sufficient justification for the use of a taser.  (Bolduc Dep. 35.)  Bolduc's approval validates and ratifies Myers's taser usage and demonstrates the City of Brainerd's potential for further constitutional violations with tasers.

## LEGAL STANDARD

Summary judgment is proper only if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the non-moving party.  Graves v. Arkansas Dep't. of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000).  Where a reasonable inference can be drawn from the evidence, that inference creates a genuine issue of material fact and summary judgment is inappropriate and should be left for the fact finder to decide what inferences to believe.  Hunt v. Cromartie, 526 U.S. 541, 552 (1999).  "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are

to be drawn in [that party's] favor.'" Id. Thus, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." Id. Proper application of this standard dooms defendants' motion.

## **ARGUMENT**

I.   **Myers Used Excessive Force on Gerdes When he Tased Gerdes Off a Moving Bicycle for a "Nickel and Dime" Offense.**

The Fourth Amendment provides protection from excessive force during an arrest. Brown v. City of Golden Valley, 534 F.Supp.2d 984, 992 (D. Minn. 2008).  Courts determine whether an officer used excessive force by examining whether the "officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Id. (quoting Winters v. Adams, 254 F.3d 758, 765 (8th Cir. 2001)).  There is no precise definition or mechanical application for the "reasonableness" test, but federal courts uniformly examine the facts of the case in light of the factors laid out in Graham v. Connor:  "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others and whether he is actively resisting arrest or attempting to evade arrest by flight."  490 U.S at 396.

In the present case, Myers used a very high level of force against Gerdes, thereby subjecting him to significant risk of injury or harm, while Gerdes had only committed an extremely minor offense and posed no danger to Myers or others.  Myers use of force was objectively unreasonable.

**A.     Myers's use of his taser on Gerdes was an extremely dangerous use of force.**

A taser is a "significantly violent level of force." Parker, 2007 WL 1468658 at *22 (D. Me. May 18, 2007) (citation omitted.)   Taser International's own operating and training materials recognize that the use of a taser can carry significant risks of injury from secondary falls.   (See Supra, Facts § A.3.a & b.)   These risks increase when an individual is operating a vehicle or when the subject is running (or otherwise moving fast like Gerdes).   (Id.)   Both Myers and Chief Bolduc admit, and common sense dictates, that bicycle crashes can cause significant injuries, including fractures.   (Myers Dep. 28; Bolduc Dep. 27-29.)   The risk of significant injury increases when a bicyclist is unable to balance or control his arms and legs to break his fall as would happen if he was tased in probe mode.   This is supported by Ruuhela's testimony that he would not want to be tased while riding a bicycle because he thinks he would fall off.   (Ruuhela Dep. 42-43.)   That a tased bicyclist would fall is no surprise given that Myers, Bolduc, and Ruuhela all agreed that a person needs control over his arms and legs to operate a bicycle.   (See Supra Facts, § D.)

The simple fact that tasing a bicyclist constitutes a severe risk of injury is also supported by PERF, which specifically warns against such a deployment, absent exigent circumstances.   (Ex. N, at p. 3.)   The risk must increase when the bicyclist is going fast like Gerdes, who was racing.   This is supported by Taser's warning of increased risks to subjects who are running. (See Ex. L, Taser Product Warnings, p. 4.)   Accordingly, Myers's use of his taser on Gerdes when Gerdes was riding his bicycle faster than Myers could run can only be described as something considerably **more than** a "significantly violent level of force," completely unjustified by an analysis of the factors in Graham v. Connor.

**B.    Gerdes's only offense was extremely minor, weighing against any use of force.**

Myers did not know that Gerdes had committed any crime on June 1, 2007.  While at the park due to a noise complaint, Myers admitted he did not know who was making noise in the park.  (Myers Dep. 62, 77-78.)  He also admitted that when he first saw Gerdes and his companions they were disbursing—meaning on the move.  (Myers Dep. 63.)  Because the city ordinance allows individuals to traverse the park after hours, Myers had no way to know if Gerdes was simply traversing the park or not.  Accordingly, Myers had no basis to stop Gerdes.  See Minn. Stat. § 629.34, subd. 1(c) (stating that an offense must be committed in an officer's presence to allow a warrantless arrest for a misdemeanor); (see also Bolduc Dep. 50).

At worst, Gerdes had violated the park ordinance, an offense Ruuhela rated as "very low level of severity."  (Ruuhela Dep. 66.)  This offense is so low that Ruuhela did not even know it was an offense.  (Ruuhela Dep. 56-67, 60-61.)  Even Myers characterized the park ordinance violation as a "nickel and dime" offense.  (Myers Dep. 85.)  Myers's view is supported by the fact that there have been no custodial arrests for violating the park ordinance.  (See Supra, Facts § A.2.)  It is further supported by Chief Bolduc's testimony that violation of the park and noise ordinances are "less serious offense[s]," below Part 2 crimes, which include minor assaults and minor offenses.  (Bolduc Dep. 7-9.)

That no one had been arrested solely for violating the park ordinance is not surprising because, under Minn. R. Crim. P. 6.01, officers must not custodially arrest misdemeanor offenders absent special circumstances not present here, but are directed to issue a citation instead.  Accordingly, Gerdes's crime, if any, was extremely minor and did

not warrant a custodial arrest, let alone Myers's significant use of force.

In desperation, the Defendants suggest Gerdes was committing the separate misdemeanor crime of fleeing from a police officer in other than a motor vehicle when he was tased. (Defs' Memo, 16.)  Defendants' suggestion confuses the issues, and Gerdes's alleged flight (which was nothing of the kind) is more appropriately analyzed in the third Graham factor below.  If resisting an arrest, which is a separate crime, or fleeing were to be analyzed here, the third Graham factor would be wholly superfluous.  However, even if fleeing was examined here, it too is a misdemeanor offense and does not justify the significant level of force Myers used.  See Wanbaugh v. Fields, 508 F.Supp.2d 723, 729 (W.D. Ark. 2007) (finding that fleeing an officer is an offense of "negligible severity.").

**C.    Gerdes posed no immediate threat to the safety of Myers or others, weighing against any use of force.**

At deposition, Myers grudgingly admitted that Gerdes was not a threat to Myers or others. (Myers Dep. 114-15.)  Rather, Gerdes was unarmed and pedaling his bicycle out of the park when he was tased from behind.  Accordingly, this factor strongly weighs against any, let alone this unconstitutional, use of force.  See Graham, 490 U.S. at 396; Brown, 534 F.Supp.2d at 993 (finding plaintiff's lack of threat to the officer weighed against officer's use of a taser on her).

**D.    Gerdes was not actively resisting and was not trying to evade arrest by flight; he simply did not see or hear Myers.**

Assuming arguendo that there was a valid reason for an arrest on the park or noise ordinance, there is no suggestion that Gerdes resisted arrest through force.  Rather, Defendants contend that he attempted to flee.  But for purposes of this motion, Gerdes did

not see or hear Myers prior to being tased, so he could not have attempted to flee.  (See Gerdes Dep. 118-19.)  Further, Myers never identified himself as a police officer.  (McSorley Dep. 36-37; Simmons Dep. 21, 28.)  The recent case of Mattson v. Becker County, 2008 WL 3582781 (D. Minn. Aug. 12, 2008) (attached as Ex. Z) is highly relevant.  In Mattson, a deputy failed to activate his lights and siren when he was following a suspected drunk driver. Id. at *1.  Even after the suspected drunk driver stopped his car and exited the vehicle, he did not know it was a squad car behind him. Id. at *2.  The deputy got out of his squad and yelled for the suspect to "stop right there or I'll shoot," but failed to identify himself as a sheriff's deputy. Id.  The deputy got within range of the suspect and fired his taser into the suspect's back, dropping him to the ground. Id.  The deputy tased the suspect again while on the ground in attempting to handcuff him and while the suspect still did not know that it was a deputy that had tased him. Id.  The court concluded that the suspect did not have intent to flee or resist arrest because he did not know he was being pursued by law enforcement. Id. at *7, Additionally, the court concluded that the deputy's conduct was unreasonable, constituting excessive force: "[a]n objectively reasonable officer would have immediately identified himself, especially knowing that the lights and sirens of his vehicle had not activated, and certainly would not have initiated communication with a threat of deadly force." Id.

Just as in Mattson, Gerdes did not know he was being pursued by law enforcement because he did not hear or see Myers. (Gerdes Dep. 118-19.)  Further, just like the deputy in Mattson, Myers failed to identify himself as a police officer and initiated communication with a threat, "stop or be tased." (McSorley Dep. 36-37, Simmons Dep. 21, 28.)  Under

these circumstances alone, Myers's taser deployment was unreasonable.   Moreover, the circumstances in this case make Myers's use of the taser much more unreasonable than the taser usage in <u>Mattson</u>: 1) <u>Mattson</u> involved a much more serious offense (DWI), while this case involved a minor, "nickel and dime" offense; and 2) <u>Mattson</u> involved a walking suspect, while this case involved a suspect on a bicycle moving faster than Myers could run, which greatly increased the risk of injury.   <u>See Mattson</u>, 2008 WL 3582781 at *1-2. Accordingly, Gerdes was not fleeing and Myers's use of the taser without identifying himself as law enforcement was unreasonable and violated Gerdes's constitutional rights.

Even if Gerdes was fleeing, fleeing a "nickel and dime" ordinance violation is not a crime sufficient to justify Myers's dangerous use of force.  <u>See Wanbaugh</u>, 508 F.Supp.2d at 729.  In <u>Wanbaugh</u>, the plaintiff was initially pulled over for making an illegal turn; however there was a felony warrant out for the plaintiff's arrest. <u>Id.</u> at 724-25.  Two officers were on the scene attempting to arrest the plaintiff, but the plaintiff tried to run away on foot. <u>Id.</u> at 725.   After a brief chase, one of the officers caught up to the plaintiff and tackled him; defendants claimed he continued to resist so they tased him repeatedly.  <u>Id.</u> at 726.  The plaintiff claimed he stopped resisting after the first time he was tased but that the officers tased him even after he was handcuffed.  The plaintiff pled guilty to second degree battery of an officer, a felony, but neither officer suffered any injuries. <u>Id.</u>  The court found that a fact question exists on whether the amount of force used was reasonable. <u>Id.</u> at 729.  The Court stated, "<u>The offenses with which Wanbaugh was charged, battery on a officer, resisting arrest, **fleeing,** and destruction of government property, are of negligible severity</u> and while they justify the use of **<u>some</u>** amount of force do not necessarily justify the amount of force

alleged to have been used [on] Wanbaugh." Id. (emphasis added).

Unlike the plaintiff in Wanbaugh, Gerdes never knowingly ran away from officers who were attempting to detain him. Moreover, he did not assault or batter any officer. Further, unlike the plaintiff in Wanbaugh, his underlying violation was not a felony warrant, but a "nickel and dime" city ordinance violation. Accordingly, the "negligible" severity of the crimes in Wanbaugh gives way to truly insignificant offenses for Gerdes, even assuming he was fleeing, which is also only a misdemeanor. See Minn. Stat. § 609.487, Subd. 6.

As set out above, PERF, the IACP, and the U.S. Department of Justice direct that fleeing alone is NOT a sufficient justification for tasing a suspect. (See Supra Facts, § A.3.b.) In short, and as noted by plaintiff's expert, "Even if one credits Officer Myers['s] account that Gerdes was fleeing, the use of a taser on someone who is fleeing on a bicycle for such a minor offense is contrary to all generally accepted policies, training, and legal mandates that are trained to officers throughout the United States." (Ex. A J. Ryan Report, ¶45.)

Accordingly, Gerdes's lack of physical resistance or flight strongly weighs against any use of force, especially the severe level of force used by Myers.

E.    **The severity of Gerdes's injury strongly suggests that Myers used excessive force.**

The severity of the injury is relevant to the determination of whether the force used was reasonable. See Patzner v. Burkett, 779 F.2d 1363, 1371 (8th Cir. 1985); See also Kukla v. Hulm, 310 F.3d 1046, 1048-50 (8th Cir. 2002) (relying on the fact that plaintiff's collarbone, shoulder, neck, and right wrist were injured during an arrest in denying officer's motion for summary judgment on plaintiff's excessive force claim); Adewale v. Whalen, 21 F. Supp. 2d 1006, 1014 (D. Minn. 1998) (relying on undisputed fact that plaintiff sustained a

broken arm as a result of the pat-down in denying officer's motion for summary judgment where officer claimed plaintiff was "compliant" and that he conducted the pat-down "without incident"); Stockton v. Auren, 2008 WL 1994992, *5-6 (D. Minn. May 5, 2008) (noting that plaintiff suffered a "severe hip fracture" from one defendant's takedown maneuver and finding that, based on the severity of the injury, a fact issue remained as to whether the amount of force used in executing the takedown was reasonable) (attached as Ex. AA). Here, the "takedown" was at high speed (faster than Myers could run) by a taser in probe mode that had the predictable total neuro muscular incapacitation of the subject, rendering him unable to balance or control his arms and legs to avoid the severity of the crash or lessen his injuries.

The injuries were also a key factor in the excessive force analysis in Foster v. Met. Airports Comm'n., 914 F.2d 1076, 1082, n.5 (8th Cir. 1990). There, the lack of permanent injury (the plaintiff testified he suffered no injury from being pushed and he offered no medical records to support any long-term injury from handcuffing) helped the court conclude that the force used was not excessive. Id. But the same analysis leads to the opposite result here because it is undisputed that Gerdes suffered a fractured collarbone and herniated disc: he was severely injured and has needed significant medical attention. (See Supra, Facts § C.) Accordingly, Gerdes's severe injury on its own suggests Myers's use of force was unreasonable--especially in the context of Gerdes's "nickel and dime" offense.

## F. Defendants' Cases on Taser Usage are Inapposite.

Defendants' cases on taser usage are not instructive because they are factually distinguishable and Defendants ignore any analysis of the Graham factors. Further,

Defendants rely on cases where the plaintiff's injuries were minor or de minimis.

Defendants cite U.S. ex rel., Thompson v. Village of Spring Valley, 2006 WL 1889912 (S.D. NY July 10, 2006) (attached to Schweic Aff. as Ex. I) and Willkomm v. Mayer, 2006 WL 582044 (W.D. Wis. Mar. 9, 2006) (attached to Schweic Aff. as Ex. J) for support that courts have found that the use of a taser on a fleeing subject did not violate that subject's constitutional rights.   (Defs' Memo 17-18.)   But both of these cases involved active resistance, not just fleeing as Defendants suggest—the plaintiff in Thompson pushed away from the officer after he was searched and told he was under arrest before he fled, 2006 WL 2889912 at *4, and the plaintiff in Willkomm physically resisted the officers' attempts to handcuff him and place him in the squad car, 2006 WL 582044 at *3.   Additionally, neither of these cases mention the severity of the plaintiff's injuries, and the factual recitation makes them sound minor.   See Thompson, 2006 WL 2889912 at *1; Willkomm, 2006 WL 582044 at *1-2 (plaintiff was medically cleared by the hospital after a blood draw was taken to evaluate his blood alcohol content).   Additionally, Willkomm involved a higher severity offense (suspected DUI) than Gerdes.   Willkomm, 2006 WL 582044 at *1-2.

Similarly, Defendants rely on Schumacher v. Halverson, 467 F.Supp.2d 939 (D. Minn. 2006) and Edwards v. City of Martin's Ferry, 554 F.Supp.2d 797 (S.D. Ohio 2008) for the proposition that an officer can use a taser on someone who refuses to comply with officer commands.   First off, both cases involve only de minimis injuries.   See Schumacher, 467 F.Supp.2d at 944 n.3 (stating plaintiff never sought medical or psychological treatment for incident); Edwards, 554 F.Supp.2d at 801 (stating "Edwards was offered but refused medical attention.").   Additionally, the suspect in Schumacher was suspected of a DWI and was

physically and verbally resisting arrest by refusing to let go of a pole.  467 F.Supp.2d at 944.

Defendants similarly mistakenly rely on Yarnell v. Mendez, 509 F.Supp.2d 421, 425-27 (D. Del. 2007) and Magee v. City of Daphne, 2006 WL 3791971 at * 10, n. 18 (S.D. Ala. Dec. 20, 2006) (attached to Schweic Aff. as Ex. K), both of which involved plaintiffs who were suspected of very serious crimes—Yarnell with 2 counts of attempted carjacking, criminal mischief, and resisting arrest (Yarnell, 509 F.Supp.2d at 427), and Magee with a domestic assault so severe that the court noted, "Make no mistake: This was a severe charge." (Magee, 2006 WL 3791971 at *10, n. 18.)  Accordingly, the Graham analysis in these cases is wholly different than for Gerdes.

Finally, Defendants posit that Myers was faced with a choice between letting Gerdes flee or escalating the amount of force by using his taser, and letting him flee was simply unacceptable. (Def's Memo, p. 20.)  Defendants oversimplify the analysis and ignore the significant dangers of tasing a suspect off of a fast-moving bicycle for an extremely minor, nonviolent crime who was not resisting and did not even see the officer.  In short, Defendants seek to avoid all Graham analysis by stating that Myers had to act or face the dire consequence of someone escaping from a crime so minor that no one has previously been arrested for it.  Under Defendants' analysis, officers could shoot jaywalkers who did not stop to receive their ticket.  This analysis is simply wrong, does not comport with Graham, and must be ignored.  The Defendants' motion for summary judgment should be denied.

**II.    Myers is Not Entitled to Qualified Immunity Because a Reasonable Officer Would Know that Tasing Gerdes Off of a Moving Bicycle Would Constitute Excessive Force and Violate Gerdes's Constitutional Rights.**

In determining whether qualified immunity applies, Courts examine whether the defendant violated a constitutional right and if that right was clearly established. Pearson v. Callahan, 129 S.Ct. *08, 815-16 (2009). While the Supreme Court's recent holding in Pearson provides lower courts with discretion to address these questions in either order, the Supreme Court has noted that it is "often beneficial" to first address the question of whether a constitutional right was violated. Id. at 818-22.

Having established that Myers violated Gerdes's constitutional rights, the question becomes whether the constitutional violation was clearly established. "[A] precedential case need not be on all fours to clearly establish a constitutional violation, but it must be sufficiently analogous to put a reasonable officer on notice that his conduct was unconstitutional." Hill v. McKinley, 311 F.3d 899, 904 (8th Cir. 2002). The Eighth Circuit subscribes to a "broad view" of what constitutes clearly established law. Tlamka v. Serrell, 244 F.3d 628, 634 (8th Cir. 2001). "The right to be free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures." Brown, 534 F.Supp.2d 984, 994 (D. Minn. 2008) (quoting Henderson v. Munn, 439 F.3d 497, 503 (8th Cir. 2006). The salient question is whether the state of the law at the time of the incident gave the defendants fair warning that their conduct was unconstitutional. Hope v. Pelzer, 536 U.S. 730, 741 (2002). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." Id.

A reasonable officer would know and appreciate the warnings provided by the manufacturer in the operating manual of any weapon he would use in his work. A reasonable officer would know and appreciate the very serious falling danger attendant to the total loss of motor coordination and balance in the operation of any vehicle in motion, including specifically a bicycle, which has nothing on it to make it crash-worthy or that protects its falling occupant. A reasonable officer does not go out on his or her shift without common sense. Accordingly, Myers is not entitled to qualified immunity.

**A.     Using a taser on a suspect who is not dangerous or threatening violates clearly established rights.**

In Mahamed v. Anderson, 2009 WL 873534 at *4-5 (D. Minn. Mar 30, 2009) (attached as Ex. BB), the court found that the October 2007 use of a taser on a suspect who was "uncooperative but not dangerous or threatening" violated the suspect's clearly established right to be free from excessive force. Significantly, the court offered no discussion on this right being only recently clearly established. Id. Similarly, in Bady v. Murhpy-Kjos, 2008 WL 3262778 at *3, 5-6 (D. Minn. Aug. 7, 2008) (attached as Ex. CC), the court found that two officers' Feb. 24, 2006 tasing of a non-resistant suspect four times while he was handcuffed and lying face down violated the suspect's clearly established constitutional rights, barring qualified immunity.

Brown, 534 F.Supp.2d at 984, is particularly on point. There, the plaintiff was a passenger in an automobile that had been pulled over on a traffic stop. Id. at 987-89. The only crime she was suspected of committing was having an open container (two liquor glasses with fluid in them) in the car. Id. Plaintiff refused to comply with two officer commands to hang up her phone prior to the officer tasing her in "drive stun" mode, where

the taser prongs are not utilized, without warning. Id. at 988-89. The court concluded that, as of October 2005, "it was clearly established that it was unreasonable to, without warning, taser a nonviolent passenger who was not fleeing or resisting arrest and was suspected of a minor, nonviolent crime, because she disobeyed two orders to get off of the telephone with a 9-1-1 operator." Id. at 995 (citations omitted).

In a case that is factually similar to the present action, McNally v. Eve, 2008 WL 1931317 at *7-8 (M.D. Fla. May 2, 2008) (attached as Ex. DD), an officer investigating a noise complaint at the plaintiff's home tased the plaintiff multiple times after the plaintiff began to walk away from the officer. The Court found the officer's conduct violated the plaintiff's constitutional rights and that the officer was not entitled to qualified immunity. Id. at *8-11. In part, this finding was based on the minor nature of the offense, a noise complaint, and the severity of the force used—the taser. Id. The court was not persuaded by the defendant officer's claim that the plaintiff was fleeing from the officer; rather, the court accepted the plaintiff's testimony that he had answered the officer's questions and was returning to his home. Id. at 8. The Court also noted that the plaintiff posed no threat to the officer or others. Id. at 7.

Just as in McNally, Gerdes was moving away from an officer but not fleeing. Also just as in McNally, Gerdes was suspected of a very minor crime—being in the park after hours (stemming from a noise complaint). But Gerdes's case is much stronger than the plaintiff's case in McNally because Gerdes was tased off a fast-moving, elevated, unstable platform and suffered serious injury, versus the relatively minor injury suffered by McNally, who was tased from a standing position or a walking pace.

Under all of these cases, because Gerdes did not resist arrest, did not threaten the officer or others, and was suspected of only a minor crime, a reasonable officer would have had clear notice that he could not tase Gerdes—especially not off a fast-moving bicycle where risk of injury is elevated. Accordingly, Myers is not entitled to qualified immunity.

**B.      Case law demonstrates that officers cannot simply knock suspects off of a bicycle for ignoring officer commands or committing minor crimes.**

Knocking someone off a moving bicycle has been found to be an unreasonable use of force. See Hullett v. Smiedendorf, 52 F.Supp.2d 817, 821-22 (W.D. Mich. 1999); Banks v. Yokemick, 144 F.Supp.2d 272, 280, n.2 (S.D.N.Y. 2001). In Hullett, a 41 year old was knocked off his bicycle by an officer (who struck the rider across the chest with his arm) because the rider refused to comply with officer commands to drive his bicycle on the sidewalk rather than the street. 52 F.Supp.2d at 820, 819-22. The Court found that the plaintiff raised a genuine issue of material fact on whether the officer used excessive force, precluding summary judgment for the officer. Id. at 821-22, 829. If knocking a suspect off of a bicycle was potentially unreasonable force, then so is tasing an individual off of a bicycle. (See Brave Dep. 124-125 (equating justification for physically tackling with justification for using the taser).)

In Banks, the defendant officer was chasing a suspect who was on a bicycle when the officer threw his radio at the suspect. 144 F.Supp.2d at 274. The officer hit the suspect in the head, causing him to fall off his bicycle. Id. He later died of his injuries. Id. On a motion unrelated to whether the officer violated the bicyclist's civil rights, the court noted, that there was a sufficient factual basis to conclude that the officer used excessive force. Id. at 280, n.2. Moreover, the subjects in Hullet and Banks, unlike Gerdes, were not wholly

incapacitated and deprived of the ability to break their fall from a moving bike. Accordingly, the fact that Gerdes was on a bicycle, with the additional risk of injury that entails, made it even more obvious that tasing him was unreasonable.

Defendants rely heavily on Jones v. Boerger, 2008 WL 4371381 (D. Minn. Sept. 22, 2008) at *3 (attached to Schweic Aff. as Ex. L) for the proposition that a reasonable officer "would not believe it was unlawful to tackle a suspect who appears to be disregarding commands to stop," analogizing that an officer would not know that tasing a suspect off of a bicycle who is disregarding a command to stop would be unlawful. Id. at *3; (Defs' Memo 23-24.) But Jones is easily distinguishable from the present action. In Jones, the Court noted that there was only a "minimal level of force used"—a push—to apprehend a suspect who was refusing officer commands, not the significantly violent level of force used by Myers, which was aggravated by Gerdes being on a fast-moving bicycle. Id. Moreover, the only injury noted by the court in Jones was a concussion; not nearly as significant as the fractured clavicle, shoulder injury, and herniated disc that required 3 surgeries here. Id. at *1. Further, in Jones, the officer had the ability to control the suspect's descent, which was not true in Gerdes's case. Id. Accordingly, Jones provides no shelter for Myers.

## III.     The City of Brainerd Is Liable Because Its Training was Deficient and It Ratified and Approved Myers's Use of Force.

A municipality may be liable for a failure to train when (1) the training practices are inadequate; (2) the municipality was "deliberately indifferent to the rights of others in adopting them, such that the 'failure to train reflects a deliberate or conscious choice by a municipality,'" and (3) an alleged deficiency in the municipality's training procedures caused the plaintiff's injury. Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996) (quoting City of

Canton v. Harris, 489 U.S. 378, 389 (1989) (additional citations omitted)). A failure to train violation can be established by showing that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton, 489 U.S. at 390. Put differently, a City of Canton claim may be established through constructive notice. See Farmer v. Brennan, 511 U.S. 825, 840-41 (1994). The City, unlike an individual state actor, is not entitled to any level of immunity, thus: "[I]f the [plaintiff] offered evidence that the training was inadequate within the meaning of City of Canton, then summary judgment [is inappropriate]." Russo v. City of Cincinnati, 953 F.2d 1036, 1046 (6th Cir. 1992). Municipal liability under City of Canton is therefore generally a question for the jury. Oviatt v. Pearce, 954 F.2d 1470, 1477-78 (9th Cir. 1992).

Russo is particularly relevant. In Russo, the Sixth Circuit reversed a district court's grant of summary judgment to the city of Cincinnati on plaintiff's City of Canton claim. 953 F.2d at 1048. The court based its decision on the plaintiff's evidence of the lack of training on the specific situation at issue in that case (officer interactions with mentally disturbed and disabled individuals) including a report by the city and on opinion testimony of the plaintiff's expert. Id. at 1046-47. In allowing the expert testimony, the Court specifically noted that "expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures." Id. at 1047.

In the present case, Gerdes satisfies the elements for a valid City of Canton claim. First, Brainerd's taser training is inadequate. Brainerd's taser instructor, Larson, does not

teach when use of force, including a taser, is appropriate even though she admitted that the first consideration for taser usage is whether use of force is authorized.  (Larson Dep. 33, 59.)  Larson clarified:  "I do not teach them **when** to use the Taser.  I teach them the use of the Taser, **how** it works and then the circumstances under which they need to consider."  (Larson Dep. 58 (emphasis added).)  As noted by Plaintiff's expert:

> Any training on a weapon used by law enforcement that merely teaches how to use a weapon and does not teach officers decision making with respect to the weapon is woefully inadequate.  To allow a training program on Taser without making the decision-making for deployment part of the lesson leaves officers with no direction as to when the weapon may be used.

(Ex. A, J. Ryan Report, 17.)

Further, Larson's own lack of understanding on the additional risk posed by tasing a subject operating a bicycle or running versus standing (Larson Dep. 22) dictates that the taser training is deficient.  Common sense dictates that an elevated risk of injury can change the use of force analysis.  For example, using a taser on someone standing on a roof-top may constitute deadly force and require deadly force authorization.  The same deadly force authorization would not be required to use a taser on the same person if he were standing on flat ground.  By stating the risk is the same regardless of what a person is doing, Larson ignores this fundamental principle.  Of course, this failure is compounded by her refusal to teach when the use of the taser is appropriate and when it is not.

Larson's ignorance of the IACP policy and the U.S. DOJ's view of taser usage also shows the deficiency of Brainerd's taser training.  (Ex. A, J. Ryan Report, p. 17.)  Larson's lack of knowledge on these topics means that the people that she trains will lack knowledge

on these topics as well.  The result is that Brainerd officers will be confronted with situations for which they were never trained and they will violate people's rights, as happened in this case.  Based on Larson's testimony and Plaintiff's expert's opinion, just as in <u>Russo</u>, Plaintiff has presented sufficient evidence to survive summary judgment.

Gerdes also meets the second prong of a <u>City of Canton</u> claim.  The second prong can be proved even by a single violation if the "municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." <u>Bd. of County Commn's. v. Brown</u>, 520 U.S. 397, 409 (1997).  Brainerd's failure to properly train Myers and others in situations that will invariably recur demonstrates Brainerd's deliberate indifference.  Brainerd equipped its officers with tasers, and there is no question that officers are going to encounter suspects who are operating vehicles (including bicycles), standing on unstable platforms, or at significant heights.  In such circumstances, the decision to deploy a taser can have serious and even deadly consequences.  Given Larson's failure to understand, and thus failure to properly teach, warnings provided by Taser regarding these elevated risks for injury, it was highly predictable that some officer would use their taser when that level of force was unjustified.  Accordingly, given the recurring nature of officer interactions with suspects in situations where taser instruction was inadequate, misuse of the weapon was highly predictable.

The second prong is also satisfied because Chief Bolduc approved of Myers's taser usage, leaving other officers free to act in the same way (i.e. tase a person solely for fleeing or tase a suspect of a minor, non-violent offense off a bicycle) without fear of sanction. (Bolduc Dep. 13.)

Finally, Gerdes satisfies the third prong of the <u>City of Canton</u> claim, causation. The causation element of a § 1983 municipality claim is generally a jury question unless, in a particular case, "the question is 'so free from doubt as to justify taking it from the jury.'" <u>Rickets v. City of Columbia</u>, 36 F.3d 775, 779 (8th Cir. 1994) (quotation omitted). The alleged training deficiency need not be the sole cause of constitutional injury; it simply must be "closely related" to the injury. <u>Canton</u>, 489 U.S. at 391.

In the present case, there is no question that Myers had not been trained not to use a taser on a person suspected of only a minor crime. Nor had he been properly advised of the elevated risk of harm in tasing a suspect on a bicycle, on an unstable platform, or operating any vehicle, although it is inexcusable for an officer to either ignore or fail to read the operating manual for any weapon he avails himself of during his duties. This lack of instruction fed into his decision to utilize the taser on Gerdes, resulting in Gerdes's severe injuries. Accordingly, Gerdes satisfies all of the elements for a <u>Canton</u> claim and the City of Brainerd's Motion for Summary Judgment should be denied.

Defendants curiously argue that Plaintiff has failed to show a custom or policy by Brainerd that violates individual constitutional rights. (Defs' Memo 25-27.) Defendants spend significant time arguing that, similar to the policy in <u>Bailey v. County of Kittson</u>, 2009 WL 294229 (D. Minn. Feb. 5, 2009) (attached to Schweic Aff. as Ex. M), Brainerd's Taser policy is constitutional. First, Brainerd's Taser Policy is not the same as the one discussed in <u>Bailey</u>, and is likely to lead to unconstitutional conduct. The taser policy discussed in <u>Bailey</u>, was actually the substantial equivalent of the policy at issue in <u>Mattson v. Becker County</u>, 2008 WL 358271 (D. Minn., Aug. 12, 2008). That policy limited taser usage to "situations

where force is justified to control aggressive and/or combative/noncompliant subjects[.]" Bailey, 2009 WL 294229 at *25 (quoting Mattson, 2008 WL 358271 at *6).  In contrast, Brainerd's Taser policy allows tasers to be used in "situations where force is justified to control an aggressive, combative **or non-combative** noncompliant subject[.]"  (Ex. I (emphasis added).)  Brainerd's policy specifically allows taser usage on non-combative subjects—a whole category not allowed by the policy discussed in Bailey and a category not allowed by PERF and the IACP.  (See Supra Facts, § A.3.b.)  In Brainerd, Ghandi and Martin Luther King could be tased with impunity.

Second, Defendants' policy argument misses the boat.  Even if they are correct, and the taser policy is fine, simply having a policy that is constitutional does not mean that Brainerd's officers are properly trained to implement that policy.  Rather, as demonstrated above, Brainerd's officers' taser training is deficient in recurring scenarios where constitutional violations are highly predictable; therefore, the City's Motion for Summary Judgment should be denied.

## CONCLUSION

Myers violated Gerdes's right to be free from excessive force by using a significantly violent level of force on Gerdes for, at worst, a nonviolent, extremely minor offense.  Myers ignored well-described risks of significant injury in tasing Gerdes off of a fast-moving bicycle.  Myers's training was inadequate and led directly to Gerdes's significant injuries, so the City is also liable.  Accordingly, the Court should deny Defendants' Motion for Summary Judgment in its entirety.

FLYNN, GASKINS & BENNETT, L.L.P.

Dated: <u>October 19, 2009.</u>

<u>s/Robert Bennett</u>
Robert Bennett, #6713
Ryan O. Vettleson, #312915
333 South Seventh Street, #2900
Minneapolis, MN 55402
Telephone: 612-333-9500
Attorneys for Plaintiff